**Bruce F. McNALLY**

v.

**NICHOLSON MANUFACTURING COMPANY.**

Supreme Judicial Court of Maine.

Nov. 30, 1973.

Smith, Elliott & Wood by Charles W. Smith, Saco, for plaintiff.

Richardson, Hildreth, Tyler & Troubh by Harrison L. Richardson, Robert E. Noonan, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and WEBBER, JJ.

WERNICK, Justice.

This case has been reported to us, pursuant to Rule 72(c) M.R.C.P., by a Justice of the Superior Court (presiding in Penobscot County). It seeks the determination of important and novel questions of the law of "products liability" in Maine which were the subject of interlocutory rulings made in a civil action instituted on October 14, 1969 by plaintiff, Bruce F. McNally, against defendant corporation, Nicholson Manufacturing Company.

Plaintiff was employed by J. M. Huber Corporation to work in its woods operation in Patten, Maine, as the operator of a skidder. The skidder conveys felled logs to a chipping machine which grinds them into chips for use in the making of pulp and paper.

Defendant manufactured a chipping machine, known as a "Nicholson Utilizer II", intended for use at the site of a woods operation. Defendant sold a "Nicholson Utilizer II" to J. M. Huber Corporation in August of 1966 and delivered it to the "Huber" place of business on May 4, 1967. It was being used at Patten on August 19, 1968 for its intended purpose. In the course of his usual work, plaintiff was brought into the immediate vicinity of the "Nicholson Utilizer II." A piece of wood was expelled with great force and velocity through an orifice in the side of the machine, struck plaintiff in the head and caused him serious personal injuries.

Plaintiff's complaint, as originally filed, consisted of two counts in each of which plaintiff alluded to the general factual situation above described and added special allegations to delineate a distinct theory of legal liability.

Count I charged "negligence" by defendant in that: (1) the basic design of the "Nicholson Utilizer II" was unreasonably inadequate because (a) it placed an orifice in the side of the machine through which wood pieces could be expelled with great force and velocity, and (b) it failed to provide a guarding mechanism, shield or device to deflect towards the ground any pieces of wood ejected through the orifice; (2) defendant failed to give notice or warning of the above described dangers in the "Nicholson Utilizer II"; and (3) defendant failed to make reasonable efforts to correct the aforesaid deficiencies which defendant, as a reasonable manufacturer exercising due care, should have ascertained.

Count II focused on the sale transaction between defendant and plaintiff's employer and the "warranties" incident to it. Defendant was said to have expressly,

" . . . by publication, advertising and salesmen's interviews, . . . represented to the plaintiff's . . . employer that the . . . Nicholson Utilizer II . . . was designed, manufactured, constructed and could be safely used for its intended purpose as a chipping machine."

It was further alleged that by the very act of sale defendant had

"impliedly represented that said machine was of merchantable quality and reasonably fit for its intended purpose."

Plaintiff claimed to have been injured in his person by breaches of the warranties.

Defendant answered—denying such material factual allegations of Counts I and II as were critical to the existence of "negligence" and "warranty" liability, re-

spectively, and averring specially as to Count I that:

"plaintiff was guilty of contributory negligence to such a degree as would bar his recovery." [1]

Subsequently, defendant filed a motion to dismiss Count II on the ground that it failed to state a claim upon which relief can be granted (as authorized by Rule 12(h) M.R.C.P.) [2] Asserting that the face of the complaint revealed that plaintiff was "not in privity of contract" with the defendant, the motion sought dismissal of Count II because, absent "privity" between the parties, a claim for breach of warranty is

" . . . barred by Maine law . . . the plaintiff's right to recovery . . . not [being] affected by the passage of 14 M.R.S.A. § 161, expressly inapplicable to transactions occurring prior to October 1, 1969." [3]

---

1. This allegation is an obvious reliance upon the provisions of 14 M.R.S.A. § 156. Bearing the heading, "Comparative negligence", it provides, inter alia:
   " . . . any person [who] suffers . . damage as [the] result partly of his own fault and partly of the fault of any other person . . . [i]f . . . found by the jury to be equally at fault, . . . shall not recover."

2. By Rule 12(h) M.R.C.P., "the defense of failure to state a claim upon which relief can be granted" is excepted from the general rule that defenses are waived which have not been raised either by appropriate motion filed previously to the filing of a responsive pleading or as included in such responsive pleading.

3. 14 M.R.S.A. § 161 was incorporated as an additional section of the Maine Revised Statutes Annotated by Section 2 of P.L.1969, Chapter 327, effective October 1, 1969. Said Section 2 read as follows:
   "*When lack of privity no defense in action against manufacturer, seller or supplier of goods*
   "*Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller or supplier of goods to recover damages for breach of warranty, express or implied, or*

After defendant had moved to dismiss Count II, plaintiff (by a series of amendments to the complaint each of which was allowed by the presiding Justice) added a third count. The allegations of this Count III purported to present a rationale of legal liability independent of, and alternative to, "negligence" (Count I) and "breach of warranty" (Count II). It averred that:
(1) the "Nicholson Utilizer II"

" . . . was defective in its design, defective in its manufacture and generally defective and because of such defects was unreasonably dangerous so that the use of said machine created a risk of harm to those in its proximity while said machine was in operation . . .";

(2) plaintiff was

" . . . unaware of the defects in the machine . . ., and said machine was without substantial change in its condition from the time of its manufacture to the time of the injury . . ."

*for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods."*

Section 1 of P.L.1969, Chapter 327, repealed and replaced 11 M.R.S.A. § 2–318 which, prior to being repealed, had provided since 1963:
"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."
By the repealer and replacement effected as of October 1, 1969, the provisions of 11 M.R.S.A. § 2–318 became the same as 14 M.R.S.A. § 161, supra.
Section 3 of P.L.1969, Chapter 327 provided that the above changes in the law as to 11 M.R.S.A. § 2–318 and the addition of a new Section 161 in 14 M.R.S.A.
" . . . shall not be construed to affect any transaction occurring prior to the effective date of . . . [P.L.1969, Chapter 327, to-wit: October 1, 1969]."

to plaintiff; and (3), therefore, defendant

". . . has become *strictly liable* to the plaintiff *by manufacturing and marketing said machine.*" (emphasis supplied)

Defendant moved to dismiss Count III for failure to state a claim upon which relief can be granted.

On August 7, 1972 the presiding Justice in the Superior Court ruled on both of defendant's motions to dismiss. He dismissed Count II of the complaint but sustained Count III as stating a good cause of action.

The basis of the dismissal of Count II was that:

"No privity of contract is alleged between plaintiff and defendant."

The presiding Justice adverted to Pelletier v. DuPont, 124 Me. 269, 128 A. 186 (1925) which had decided that privity of contractual relationship between the parties is essential to a plaintiff's recovery for breach of warranty.

Count III was upheld because the presiding Justice conceived it as

"charging strict liability on the part of the defendant to the plaintiff",

a principle which he regarded as established in the *tort* "products liability" law of Maine within the doctrine of Section 402A of the Restatement of Torts,

Second.[4] The theory was that although this Court

". . . has not approved the use of the phrase 'strict liability', . . .",

its analysis in Wallace v. Coca-Cola Bottling Plants, Inc., Me., 269 A.2d 117 (1970), concerning events in the year 1966, ". . . compels the conclusion" that Count III, containing allegations adequate to meet the specifications of the Restatement of Torts, Second, Section 402A, states a good cause of action for "strict liability in tort."

We disagree with each of the conclusions of the presiding Justice. We decide that Count II (breach of warranty) does, but Count III (strict liability in tort) fails to, state a claim upon which relief can be granted.

I

■ We sustain the "breach of warranty" gravamen of Count II on the basis of 11 M.R.S.A. § 2–318 as enacted in 1963 and in force until entirely rewritten effective October 1, 1969. (See footnote 3, ante).

Thirty-eight years had intervened between the decision of Pelletier v. DuPont (1925) and the 1963 formulation of 11 M.R.S.A. § 2–318 (hereinafter described simply as Section 2–318). During that period there had been major developments in other jurisdictions reflecting a relaxation, or abandonment, of "privity" requirements for breach of warranty recovery.[5] In Maine,

---

4. Section 402A, Restatement of Torts, Second (1965) provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

5. In 1931 Justice Cardozo observed in Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931): "The assault upon the citadel of privity is proceeding in these days apace." (p. 445) The subsequent history of the "assault upon the citadel", to, including, and after, the landmark decision of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), as well as multifaceted analyses of the developments, may

however, no case had come to this Court affording opportunity for thorough reevaluation, in light of developments elsewhere, of the actual decision or doctrine of Pelletier v. DuPont.[6]

Similarly, there had been no intervening attention to the problem by the Maine Legislature.

Thus, the full significance of the public policy change produced by Section 2–318 —adopted as one provision of the Uniform Commercial Code—is best elucidated by a direct comparison of Section 2–318 with Pelletier v. DuPont.

Product-wise, in Pelletier v. DuPont breach of warranty recovery was sought as to contaminated food. This Court conceded that by 1925 many courts had allowed breach of warranty recoveries, absent privity of contractual relationship between the parties, in cases involving

> "the sale of drugs and . . . food products . . . intended for human consumption . . .." (124 Me. at p. 272, 128 A. at p. 187)

Yet, Pelletier v. DuPont decided:

> ". . . this court, . . ., finds no good reason for repudiating or modify-

ing, . . ., the well-established rule that in order to recover on a warranty, there must be a privity of contractual relations between the parties, . . .." (p. 275, 276, 128 A. at p. 189)

Section 2–318 operated, product-wise, generally across the board; all "goods", as defined by Section 2–105(1) of the Uniform Commercial Code, were affected. Thus, in one broad sweep Section 2–318 had comprehended the step-by-step developments in other jurisdictions by which in actions for breach of warranty exceptions to "privity" requirements had been established for special kinds of products—first, drugs and articles of food and drink (products of intimate internal bodily use) then, by analogical extension, toiletry and cosmetic articles (products of intimate external bodily use), and, ultimately, under the impact of the New Jersey decision in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), mechanical products in general.

Although Section 2–318 thus treated products comprehensively, its changes in the Pelletier v. DuPont "privity" requirements were narrow. They are best understood when clarified by the frequently dis-

be found in an extensive literature on the subject. The following, inter alia, will be found most beneficial: Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960) ; Jaeger, Privity of Warranty: Has the Tocsin Sounded? 1 Duquesne L.Rev. 1 (1963) ; Keeton, Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Texas L.Rev. 855 (1963) ; Note, Strict Products Liability and the Bystander, 64 Colum.L.Rev. 916 (1964) ; Jaeger, How Strict is the Manufacturer's Liability?; Recent Developments, 48 Marq.L.Rev. 293 (1965) ; Speidel, The Virginia "Anti-Privity" Statute: Strict Products Liability under the Uniform Commercial Code, 51 Va.L.Rev. 804 (1965) ; Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965) ; Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966) ; Shanker, Strict Tort Theory of Products Liability and the Uniform Commercial Code, 17 W.Res.L.Rev. 5 (1965) ; Littlefield, Some Thoughts on Products Liability Law: A

Reply to Professor Shanker, 18 W.Res.L.Rev. 10 (1966) ; Comments, Cave Adstantem: Bystander Recovery in Products Liability Cases, 2 Creighton L.Rev. 295 (1969) ; Note, Products Liability—Wholesaler—Economic Loss, 19 Maine L.Rev. (No. 1) 92 (1967) ; Donovan, The Emerging Confrontation Between the Expanding Law of Torts and the Uniform Commercial Code, 19 Maine L.Rev. (No. 2) 181 (1967).

6. In Sams v. Ezy-Way Foodliner Company, 157 Me. 10, 170 A.2d 160 (1961) this Court made a passing reference to the point that the ground of decision in Pelletier v. DuPont was "lack of privity." (p. 17, 170 A.2d 160) The purpose of the reference was, however, precisely to emphasize that in Sams v. Ezy-Way Foodliner Company this Court was not concerned with, and was, therefore, not evaluating the question of whether " . . . recovery upon . . . warranty would be open to one not in privity with the defendant." (p. 18, 170 A.2d at p. 165)

cussed distinction between a "vertical" and "horizontal" lack of privity.

"Vertical privity lies within the marketing chain and denotes the relationship existing between the parties in the several transactions among the manufacturer, wholesaler, retailer, and ultimate retail purchaser. Where goods are distributed through this four-linked chain, there are three distinct sales transactions. Since the manufacturer sold only to the wholesaler, he is in privity with him alone. The wholesaler, on the other hand, since he purchased from the manufacturer and sold to the retailer, is in privity with both the manufacturer and the retailer; he is not, however, in privity with the consumer because the consumer had no part in either of the two transactions. Similarly, the retailer is in privity with the wholesaler and the retail purchaser, but not with the manufacturer. The ultimate purchaser, of course, is in privity only with the retailer. Whenever one of these parties attempts to enforce a contractual or sales law obligation, a warranty, for example, vertically along the distributive chain against one with whom he was not dealt, he is said to lack [vertical] privity. . . .

" 'Horizontal privity, so denominated because it does not involve clambering up the marketing chain, arises only after all resales have been completed and one reaches the flat plane spreading outwards from the last purchaser.' It refers to the problem presented when the person injured by the products is someone other than the buyer and he seeks to reach the retailer."[7]

Pelletier v. DuPont involved a "vertical" lack of privity; plaintiff who had purchased from a retailer was seeking to enforce a breach of warranty claim beyond the retailer in the marketing chain— against the processor. Section 2-318 applied in terms to particular "horizontal"

absences of privity. Section 2-318 thus did not affect the actual decision of Pelletier v. DuPont. Clearly and expressly, however, it made inroads upon the general doctrine of Pelletier v. DuPont since it conferred rights of recovery for breach of warranty against the last purchaser's "seller" in favor of designated persons outside the "vertical" distributive chain.

These "horizontal" relationships to the last purchaser were described in Section 2-318 in terms of: (1) a "natural person" "injured in [his] person by breach of the warranty", (2) who is "in the family or household" or "a guest in . . . [the] home" of the last purchaser and (3) who "it is reasonable to expect" is a

". . . person [who] may use, consume or be affected by the goods . . .."

In the case at bar plaintiff clearly meets all of the criteria textually stated in Section 2-318 except that plaintiff, a natural person, was an employee of a "buyer" which, as a corporation, was a non-natural person.

Thus emerges the issue whether the "horizontal" relations textually mentioned in Section 2-318—"in the family or household" or "a guest in . . . [the] home" of the last purchaser—are to be given a strictly literal interpretation which excludes any other relationship no matter how closely akin, policy-wise.

We regard the "Uniform Commercial Code Comment" as an official source of guidance in the interpretation of the Code. Section 3 of the Comment to Section 2-318 stated that "beyond" the "beneficiaries" textually described, Section 2-318

". . . is neutral and is not intended to enlarge or restrict the developing *case law on whether the seller's warranties, given to his buyer who resells, ex-*

---

7. Peter A. Donovan, "The Emerging Confrontation Between the Expanding Law of

Torts and the Uniform Commercial Code", 19 Maine L.Rev. (No. 2) 181, 218 (1967).

*tend to other persons in the distributive chain."* (emphasis supplied)

The emphasized language crystallizes, in our view, the particular respect in which Section 2–318 was calculated to be "neutral" in connotation or implication and, therefore, without bearing

". . . to enlarge or restrict . . . developing case law . . . ."

We have already observed that Section 2–318 concerned only the area of "horizontal" lack of privity and was silent as to the "vertical" absence of privity. Such silence might have suggested, by negative implication, that Section 2–318 intended to prohibit "warranty" recovery rights in persons in the "vertical" chain of distribution who seek to skip over immediate "vertical" privity linkages. Paragraph 3 of the Comment gave the definitive answer. Section 2–318 was "neutral"; it was "not intended to enlarge or restrict . . . case law" as it might be developing relative to "vertical" privity issues.

This distinction between the "horizontal" and "vertical" absence of privity elucidates the true reach of the decision in Henry v. John W. Eshelman & Sons, 99 R.I. 518, 209 A.2d 46 (1965) and distinguishes it from the case at bar. *Eshelman* involved the chain of "vertical" privity; plaintiff, a purchaser from the retailer, was claiming a right to recover for breach of warranty against the manufacturer who had sold to the retailer. The problem in *Eshelman* was whether Section 2–318, and the policy changes it reflected, authorized a skip over one link in the chain of "vertical" distributive privity. One year before Section 2–318 had been enacted in Rhode Island (in 1956), case law—Lombardi v. California Packing Sales Company, 83 R.I. 51, 112 A.2d 701 (1955)—had reaffirmed a prior judicial denial of the right of a plaintiff to recover for breach of warranty by skipping "vertical" privity links. In Wolf v. S. H. Wintman Co., 87 R.I. 156, 139 A.2d 84 (1958), decided two years *after* the enactment of Section 2–318, *Lombardi* was reaffirmed. With such the "developing case law" in Rhode Island, there was reason for the conclusion in *Eshelman* that

"the question whether . . . section [2–318] has any applicable significance is purely academic." (209 A.2d at p. 50)

In the present case, however, plaintiff is not claiming authorization under Section 2–318 to skip "vertical" privity links. Here, the issue relates only to a "horizontal" lack of privity, the area which Section 2–318 explicitly covers. Furthermore, for 38 years this Court had not reassessed the public policy of Maine as to lack of privity in breach of warranty cases in any aspects —"vertical", "horizontal" or otherwise.[8]

Against this background of public policy in Maine, we find in the Uniform Commercial Code Comment to a section other than Section 2–318 itself—namely, in Section 2–313 (three hundred thirteen), the indications of the appropriate judicial approach to Section 2–318 (three hundred eighteen). Mentioning the "lines of case law growth" concerning the problem of whether

"warranties need not be confined . . . to the direct parties to . . . a contract",

the Code Comment to Section 2–313 (three hundred thirteen) cross-refers to Section 2–318 (three hundred eighteen) and says:

"The provisions of Section 2–318 on third party beneficiaries expressly recog-

---

8. The literature makes reference also to a "diagonal" lack of privity. It would be involved in situations in which a person who is outside the distributive chain, and whether or not in a relationship "horizontally" to the last purchaser, seeks a recovery by skipping the last purchaser's "seller" to reach one standing anywhere higher in the "vertical" chain of distribution. The "bystander" cases recently coming to the forefront of discussion are the most striking examples of the "diagonal" absence of privity. See: 19 Maine L.Rev. (No. 2) 181, 218 (1967).

nizes this case law development *within one particular area.* Beyond that, the matter [of lack of privity] is left to *the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise.*" (emphasis supplied)

The "particular area" expressly dealt with by Section 2–318 is, as we have explained, the extension to persons outside the distributive chain, having various "horizontal" relationships to the last buyer, of rights to recover for breach of warranty against the person who was the "seller" to that buyer. Hence, it is as to this area of appropriate "horizontal" relationships that the official Comment to Section 2–313 (three hundred thirteen) states that the "policies" underlying Section 2–318 (three hundred eighteen) should provide

"useful guidance . . . [for] further cases as they arise."

On this basis, we conclude that it is intended that the appropriate judicial approach to Section 2–318 be a case by case accommodation to its recognizable policy objectives. The literal specifications of Section 2–318 are the guideposts of a fundamental course of policy flow adaptable to encompass other relationships which, policy-wise, may be fairly regarded as functionally equivalent to those textually designated.

We discern in Section 2–318 a changed conception of the realities of the ·marketplace—recognition that the total process by which products are placed, and distributed, into the market seeks to reach a broad segment of the public extending significantly beyond those who may have contract relationships to the products; and that to this group those engaged in the manufacture and distribution of products are continuingly directing representations, express and implied, for acceptance and reliance. Section 2–318 purported to identify this class as those persons

". . . it is reasonable to expect . . . may use, consume or be affected by the goods . . . .·"

Simultaneously, however, Section 2–318 sought to reflect that a Code designed to operate in the commercial sphere, and which, therefore, properly should regulate warranties in their *consensual and contractual* aspects, should derive the principles of regulation from the consensual and contractual features of warranties. To extend "warranty" rights of recovery to all persons who, in *reasonable expectation,* ". . . may use, consume or be affected by . . . . goods" coming into the market-place, and in entire disregard of privity of contractual relationships, would be essentially to obliterate the *consensual and contractual* aspects and bring to the forefront *tort* policies and considerations (predicated on the status relationships to each other of persons in society).[9] It was

9. A 1949 draft of the contents of Section 2–318 of the Uniform Commercial Code based on Section 43 of the Uniform Revised Sales Act (as, per Proposed Final Draft No. 1, 1944) had read as follows:

"*Third Party Beneficiaries of Warranties Express or Implied.* A warranty extends to any natural person whose relationship to the buyer is such as to make it reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person or property by breach of the warranty. A seller may not exclude or limit the operation of this section."

When Section 2–318, as it was ultimately promulgated in the Uniform Commercial Code and enacted in Maine in 1963, is compared with this 1949 draft, it becomes apparent

that the 1949 draft was more comprehensive, insofar as it (1) essentially abolished the concept of privity in its entirety more along the lines of *tort* conceptions by which the criterion is "reasonable expectation" as to use, consumption or being affected by the goods, and (2) property damage was included in addition to injuries to the person.

The Permanent Editorial Board to the Uniform Commercial Code has continued to give the entire problem its attention. In its 1966 *Official Recommendations for Amendments of the Uniform Commercial Code* it presented revised official comments to Section 2–318. It reported that as of 1966 it had failed to find a national consensus concerning the scope of *warranty* protection which is "proper." If offered three alternatives for further legisla-

to avoid such result (deemed improper in a Commercial Code), and more adequately to mirror the *contractual* regulatory function of the Uniform Commercial Code, that Section 2–318, as first officially promulgated and as it was adopted in Maine in 1963, carved out a much narrower group within the more comprehensive class of persons

"it is reasonable to expect . . . may use, consume or be affected by the goods . . . ."

The benefits of Section 2–318 were afforded only to those within such general class who, in addition, had such particular relationships, "horizontally", to the last purchaser in the distributive chain as would appropriately reflect the emphasis on consensuality—insofar as the relationships made it highly likely that the last purchaser would *want* (*consensually* intend) persons in such relationships to have the protections of the warranties made to him by his seller.

In light of this fundamental policy approach in Section 2–318, we conclude that

Section 2–318 imports that the present plaintiff, by virtue of his being an employee of the last purchaser of the "Nicholson Utilizer II" and who in the course of his employment duties was required to be in contact with, or close proximity to, that machine, is to be recognized as a beneficiary of the warranties given to his employer. It is plain that plaintiff's employer would *want* the plaintiff, as a "donee-beneficiary", to be protected by warranties, express or implied, relating to the fitness and safety of the "Nicholson Utilizer II" when used for the purposes for which it was intended. Delta Oxygen Company, Inc. v. Scott, 238 Ark. 534, 383 S.W.2d 885 (1964). Indeed, in the present circumstances, it takes only the attribution of a figurative bent to the word "family" to bring plaintiff, as an employee of a corporate "buyer", within the policy scope of Section 2–318 since plaintiff may be regarded as a member of such "family" as a corporation may reasonably be said to have.[10]

lative consideration to allow the individual states better to reflect the philosophies in the treatment of "warranty" protections which may be thought "proper" in a Commercial Code. (See: Section 2–318, 1966 Recommendations, Reasons for Change 9).

"Alternative A" contains the language in which Section 2–318 was originally formulated in the Code and as Maine had adopted it in 1963.

Alternative B sounds very much like the original 1949 draft deriving from Section 43 of the Uniform Revised Sales Act (which never came to fruition) with the exception that Alternative B does not contemplate recovery for damage to property as did said Section 43. Alternative B reads:

"A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

Alternative C reads:

"A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may

not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends."

It will be recognized that Alternative C is the broadest of all, insofar as, essentially, it abolishes privity and does not itself impose restrictions upon the kind of injury for which there may be breach of warranty recovery—whether injury to the person, to property, or in the nature of loss of bargain or consequential economic loss. As to types of damage other than injury to the person, Alternative C does, however, authorize a seller, by his own exclusions or limitations, to ensure that such other damage for breach of warranty shall be recovered only by a person who is in contractual privity with him.

10. We are aware the decision of the Supreme Court of Pennsylvania in Hochgertel v. Canada Dry Corporation, 409 Pa. 610, 187 A.2d 575 (1963) is contrary to the conclusion reached by us.

Subsequent decisions in Pennsylvania have left *Hochgertel* to wither on the vine. Its vitality was enormously drained by Yentzer v. Taylor Wine Company, Inc., 414 Pa. 272, 199 A.2d 463 (1964) when the Court seized upon the fact that the injured employee had been the purchaser of the goods, (although in

We see no impediment to the inclusion of the employer-employee relationship within the policy spirit of Section 2–318 in the fact that the comprehensive reformulation of Section 2–318 in 1969 (effectuated by P.L.1969, Chapter 327, Section 1) undoubtedly embraced it by its textually written concepts and simultaneously directed that the Act

" . . . shall not be construed to affect any transaction occurring prior to [its] . . . effective date . . ."

i. e., October 1, 1969.

Had the 1969 change undertaken only and no more than narrowly to add specifically to the literal listing of the particular relationships to the last buyer, the command of prospective applicability might be significant for present purposes. The 1969 reformulation, however, was not directly and solely concentrated upon enlarging the literally stated relationships to the ultimate purchaser which, notwithstanding lack of "horizontal" privity, would allow recovery for breach of warranty. Rather, it embodied an onslaught of monumentally massive proportions to eliminate "lack of privity" in any of its aspects ("horizontal, vertical or diagonal") as a defense in actions of breach of warranty. Under the 1969 enactment, so long as the plaintiff who seeks recovery for breach of warranty, express or implied, is

" . . . a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods"

(a concept which in appropriate situations could include even "bystanders"), "lack of privity between plaintiff and defendant" will not defeat plaintiff's recovery. This is true regardless of (1) the position of the defendant in the chain of distribution as a manufacturer, seller or supplier of goods, (2) the nature of the plaintiff as a "natural" or other type of "legal" person, and (3) the kind of injury sustained—whether injury in person or to property or in the form of economic loss, including loss of the bargain as well as consequential economic damage.

It is hardly surprising that in effecting a policy change of such overwhelming magnitude, the legislature would be concerned to ensure only prospective applicability. From this it fails to follow, however, that the legislature in 1969 intended to interfere with this Court's authority to interpret prior legislation as including within its public policy particular situations which happen to be duplicated within the extensively enlarged scope of the subsequent statute. This remains true notwithstanding that this Court's interpretation of the prior statute might involve an adaptation of its textual language adequately to reflect its basic policy.

We reject, therefore, as applied to the present context, the contention that the legislature's directive of prospectivity concerning its 1969 reformulation of Section 2–318, by negative implication, has retrospective force to preclude an interpretation

---

effecting the purchase he had been acting as agent of his corporate employer) to bring the employee within the protective umbrella of Section 2–318. In addition, the Pennsylvania Supreme Court's decision in *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968), notwithstanding that the Court professes lip service to *Hochgertel* as "undisturbed", leaves *Hochgertel* fundamentally desiccated. One "vertical" privity is eliminated as a pre-condition of breach of warranty recovery, as *Kassab* decides, the logical underpinning for retaining an absolutely literal approach to the Section 2–318 treatment of "horizontal" absence of privity must crum-

ble. As Professor Shanker incisively makes this point:
"It appears most incongruous that the Code . . . permit a court to eliminate privity —a *contract* idea—within the distributive chain, where the injured party was a party to some *contract* of purchase respecting the goods, but then should be [interpreted to have] denied that power as to non-purchasers of the goods who never were involved in any sales *contract* at all."
Shanker, Strict Tort Theory of Products Liability and the Uniform Commercial Code, 17 W.Res.L.Rev. 5, 27 (1965).

by this Court that an employee of the last purchaser was a proper "beneficiary" under Section 2–318 as it had established the public policy of Maine before the 1969 legislation came into being.

Under Section 2–318, as effective in 1966–1968 when the transactions and events involved in the case at bar had occurred, Count II stated a claim for breach of warranty upon which relief can be granted.

## II

We decide that Count III (strict liability in tort) must be dismissed for failure to state a claim upon which relief can be granted.

Initially, we explore those aspects of the concept of "strict liability in tort" which are here material.

The liability is denominated "strict"— rather than, for example, as "absolute" or an "insurer"—to signify that while "negligence" of the defendant is not a requisite, there must be at least some "fault" in the product (something "wrong" in it) as the legal cause of injury.

When *tort* law adopts "strict" liability, it is utilizing, essentially, a type of liability traditionally known in the "warranty" field of products liability. The liability for "breach of warranty" has always been imposed as a "strict" liability insofar as it comes into being, notwithstanding that defendant has exercised reasonable (or greater than reasonable) care, because of some kind of "fault" (something "wrong") in the product.

The fundamental difference which can emerge, however, by originating "strict" products liability on a *tort,* rather than "warranty", rationale is that the "consensual-contract" features historically predominant in "warranty" will not become the

fundamental determinants of the nature and scope of the regulatory principles which will constitute the content of the doctrine. In *tort,* special "consent", or "contract", arrangements are not of the essence of, but are rather coincidental to, the origin of duties. In *tort,* obligations are created by virtue of the *status* relationships of persons in society and, therefore, the rationale of their existence is not only independent of consent but also precludes the effectiveness of consensual arrangements purporting to deny or limit the obligations. Hence, when "strict" products liability stems from a *tort* source:

"  .   .   .   rules  .  .  . developed to meet the needs of commercial transactions cannot properly be invoked to govern  .  .  .  unless those rules also serve the purposes for which such liability [in tort] is imposed." Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1963).

Thus, a "strict" liability arising in *tort* should, in principle, have no involvement with "privity" limitations—"privity" being a "contract" concept without basic relevance to the creation of legal obligations by reason of status relationships.

Unfortunately, and as will become most critical to the present decision, the *tort* law of products liability developed historically contrary to the dictates of sound theory. The aberration has been recounted and analyzed too often by jurists and legal scholars to be repeated here in detail.[11] It suffices that we mention the dictum of Lord Abinger in Winterbottom v. Wright, 10 M. & W. 109, 152 Eng.Rep. 402 (Exch. 1842)—that "the most absurd and outrageous consequences  .  .  . " would ensue should a plaintiff be permitted to recover against a defendant in tort[12] when

---

11. The law review articles mentioned in footnote 5, ante, are most enlightening in this respect.

12. In discussing the *tort* law of products liability as it was known prior to approximately 1950, we think it unnecessary to distinguish

" . . . there is no privity of contract between the parties."

This dictum took firm root in the tort law of products liability. "Privity of contract" relationships became a necessary condition, generally, of the existence of *tort* products liability, subject only to some exceptions for particular kinds of products deemed "inherently dangerous." So "normal" had the "privity" perversion of tort theory become that the case which, at long last, initiated the momentum to set things right— MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916)—would be hailed as "landmark" and "revolutionary."

Often, however, the decisions which the perspectives of history recognize as monumental, because of their new directions, are written (to allow them more readily to achieve acceptance in their own times) in language which does not precipitously depart from prevailing concepts but retains them and manipulates them into enlarged molds more responsive to current needs. Thus it was with MacPherson v. Buick. The language of the decision retained the gloss of affirming the vitality of "privity" requirements but expanded the scope of the exception for products "inherently dangerous." "Inherently dangerous" was held to encompass any product

" . . . the nature of . . . [which] is such that it is reasonably certain to place life and limb in peril when negligently made, . . . ." (p. 1053)

The MacPherson v. Buick approach was assimilated into the law of Maine in 1923 by Flaherty v. Helfont, 123 Me. 134, 122 A. 180 (1923). It was absorbed, however, not as an outright repudiation of past doctrinal error but as reaffirming "privity" to be the general governing principle subject to the exception

" . . . of substances or instrumentalities which are imminently dangerous

"negligence" from "strict" (without negligence) liability since prior to the last two decades "negligence" was the sole basis of products liability recognized by tort law.

. . . [h]igh explosives, poisons and impure foods . . . [being] examples." (p. 137, 122 A. at p. 181)

as extended by MacPherson v. Buick to include products

" . . . not ordinarily . . . imminently dangerous instrumentalities. . . . that . . . may become so through latent defects . . . ." (p. 137, 122 A. at p. 181)

As had happened with the Pelletier v. DuPont pronouncement that "privity" is essential to "warranty" products liability, so it fortuitously occurred in Maine that after the Flaherty v. Helfont formulation of "privity" as an indispensable pre-condition of *tort* products liability, and prior to the action of the legislature in 1969, no case had come to this Court enabling it to reassess Flaherty v. Helfont in the light of progressive developments occurring in the great majority of other jurisdictions.

In this connection, we must note that the view taken by the presiding Justice of the import of Wallace v. Coca-Cola Bottling Plants, Inc., Me., 269 A.2d 117 (1970) (relating to transactions and events which had occurred in 1966) is erroneous. *Wallace* neither in terms nor in effect changed the doctrine of Flaherty v. Helfont, either (1) to eliminate "privity" requirements from products liability *in tort* (as traditionally acknowledged to rest upon "negligence") or (2) to recognize a new kind of *tort* products liability, a "strict liability in tort" conceived operative independently of 'both "privity" requirements and "negligence." First, as to the "privity" aspects, while there was in fact a "lack of privity" between plaintiff and defendant in *Wallace,* in this aspect *Wallace* represented only a concrete instance of the "contaminated food" *exception* to "privity" requirements explicitly recognized in Flaherty v. Hel-

Hence, we shall use the general designation "tort" even though the cases would be speaking in terms of "negligence."

font. Indeed, this "food" exception had already been so firmly established in the tort law of Maine that in *Wallace,* as in Lajoie v. Bilodeau, 148 Me. 359, 93 A.2d 719 (1953), this Court saw no reason even to mention it; it was taken for granted. Second, as to whether the decision in *Wallace* truly had the effect of authorizing a type of *tort* products liability existing without need for proof of "negligence", *Wallace* was plain and explicit that, in the ultimo, defendant was liable *only if defendant was negligent.* While the effect of the *Wallace* decision may have been to make it easier for plaintiff to have the question of defendant's negligence reach the fact-finder (instead of its being foreclosed as a matter of law for failure of adequate evidence by plaintiff to meet the requisite burden of proof reposing upon plaintiff to show defendant's negligence by a fair preponderance), *Wallace* continued to require the fact-finder to hold defendant liable only if defendant be guilty of *negligence.* Under *Wallace,* the presiding Justice must so instruct the fact-finder; and the defendant will escape legal liability if the evidence as a *totality* (and not merely in terms of the case presented by plaintiff) fails to establish, preponderantly, that defendant is guilty of negligence.

Thus, in the years after Flaherty v. Helfont and until 1969 this Court had neither decided, strongly intimated nor otherwise suggested that, as was generally being held in the overwhelming majority of other jurisdictions, "privity" strictures should be eliminated from the *tort* products liability law of Maine—thereby to bring to reality the most significant facet of Justice Cardozo's reasoning in MacPherson v. Buick:

"We have *put aside* the notion that the duty to safeguard life and limb, when the consequences . . . may be foreseen, grows out of contract . . . . *We have put the source of the obligation where it ought to be. We have put its source in the law."* (emphasis supplied) (p. 1053 of 111 N.E.)[13]

Moreover, after Flaherty v. Helfont and prior to 1969 there had been no legislative relaxation of the "privity" requirement operative in *tort* products liability, as there had been such legislative intervention into "warranty" products liability law by the enactment in Maine in 1963 of the Uniform Commercial Code and, in particular, Section 2–318 of 11 M.R.S.A.

It was against such background of *tort* products liability law in Maine, under which the "privity" requirements of Flaherty v. Helfont were controlling, that the legislature in 1969 enacted 14 M.R.S.A. § 161 effective October 1, 1969.

In addressing itself to "privity" as operative in *tort* (as differentiated from "warranty") the legislature used the words, "any action . . . for negligence." Since, however, as of 1969, "negligence" was the only avowedly acknowledged permissible gravamen of *tort* products liability in Maine, we conclude that it was the legislative purpose to import by the language, actions "for negligence" the *entirety of tort* approaches to products liability whatever the particularly formulated incidents.

When thus acting in 14 M.R.S.A. § 161 fundamentally to eliminate "lack of privity" as a defense in the law of *tort* products liability, the legislature could have chosen to manifest (either by saying nothing or in

---

13. In 1946, the Supreme Judicial Court of Massachusetts had been afforded opportunity to decide Carter v. Yardley & Co. Ltd., 319 Mass. 92, 64 N.E.2d 693 (1946) and to conclude:

"In many recent cases . . . [the] asserted general rule of nonliability [in tort] to persons not in privity of contract has been denied, either in terms or in effect, . . . .

"The time has come for us to recognize that that asserted general rule no longer exists. In principle it was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We now abandon it . . . . ." (p. 700)

explicit language) that it considered immaterial whether transactions occurring prior to the effective date of the statute, October 1, 1969, would be held affected by the change in the law. Had the legislature indicated such neutrality, this Court would be here free, as it would find appropriate policy justifications, to announce and apply under Count III of the complaint a new type of *tort-recognized* products liability— whether as expounded by the Restatement of Torts, Second, Section 402A or Greenman v. Yuba Power Products, Inc., supra, —characterized in its essence by the elimination not only of "negligence" criteria but also of "privity" limitations.

The legislature elected, however, to decline to be neutral. It explicitly commanded that insofar as "lack of privity" had been eliminated as a defense in products liability arising from *tort*, the change was *not* to affect transactions occurring before October 1, 1969.

We are thus constrained to hold that this legislative directive preserves the "status quo ante" intact as to transactions occurring prior to October 1, 1969. Its effect was to require that the "privity" prescriptions of Flaherty v. Helfont concerning products liability in tort be controlling as to such transactions.

A highly technical argument might suggest that since the legislature's 1969 pro-

spectivity mandate was concentrated *solely on the "privity"* question and in no respect concerned the matter of whether *"negligence"* must remain the *sole* gravamen of *tort* products liability, this Court remains free to promulgate in the case at bar (notwithstanding that it involves a transaction and events which had occurred prior to October 1, 1969) a "strict" (without "negligence") *tort* products liability which, to meet the prospectivity mandate as to the elimination of "privity" restrictions, remains subject to "privity" requirements as enunciated in Flaherty v. Helfont.

Regardless of whether the present plaintiff might benefit from the pronouncement of such a doctrine (under Count III of the complaint), we deem it unthinkable in principle that we should introduce into the law of Maine a rule of "strict" (without "negligence") *tort* products liability in a context in which, by having it born enveloped in a suffocating membrane of "privity", we endanger its future vitality and soundness.

We are satisfied that if there is to come into the law of Maine a *tort* doctrine of "strict" products liability, concomitant with the already existing "warranty" "strict" products liability, its arrival will be justifiable, basically, precisely by virtue of policy considerations which demand the elimination of the "contract" factors attaching to "warranty"—whether as reflected in the Uniform Commercial Code [14] or otherwise

---

14. The legislature's 1969 recasting of 11 M.R. S.A. § 2–318 has eliminated from "warranty", as a source of "strict" products liability doctrine, the limitations of "privity" on a basis highly akin to that which would result from a *tort* approach. Nevertheless, the Uniform Commercial Code continues to retain other types of contract limitations and defenses which will remain controlling in cases seeking recovery on a "warranty" rationale of "strict" products liability and which would not be operative in a *tort* approach.

Furthermore, even though the resort to a *tort* rationale of "strict" products liability, co-existing with the 1969 "warranty" approach (as freed of "privity" strictures), might create potential for duplication, there would nevertheless seem to be an abundance of situations in which the relevant policy needs may be more adequately fulfilled by

use of the distinctive features of "tort" rather than "warranty" as the source of "strict" products liability principles; and, similarly, in other situations the "warranty" gravamen may better satisfy policy demands. In short, it may well be that there is room for both a "tort" and "warranty" approach to "strict" products liability, each having its own unique contribution to make.

For enlightening discussion of this general subject-matter—which this Court will surely be required to evaluate if it is called upon to introduce "strict" products liability *in tort* into the law of Maine as to transactions occurring on and after October 1, 1969—see: Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968); Elmore v. American Motors Corp., 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84

—as significant determinants of, or influences in, the shaping of legal content. To promulgate a *tort* "strict" products liability, therefore, in the case at bar burdened as it would have to be (in light of the prospectivity command of 14 M.R.S.A. § 161) with shackles of "privity"—a "contract" concept and requirement—would be to perpetrate an intolerable incongruity.

A *tort* doctrine of products liability, characterized by an independence of both "negligence" criteria and "privity" strictures, must wait, then, before it may enter Maine law through judicial action, until a case is presented in which the transaction and events involved occurred on or after October 1, 1969.

Count III of the present complaint thus fails to state a claim upon which relief can be granted.

The entry is:

The rulings by the presiding Justice on defendant's motions to dismiss are vacated.

The defendant's motion to dismiss Count II of the complaint for failure to state a claim upon which relief can be granted, is denied.

The defendant's motion to dismiss Count III of the complaint for failure to state a claim upon which relief can be granted, is granted; Count III of the complaint, is dismissed.

WEBBER, J., sat at argument but retired before the decision was rendered.

All Justices concurring.

(1969) ; Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83 (1970) ; Wasik v. Borg, 423 F.2d 44 (2nd Cir. 1970) ; Howes v. Hansen, 56 Wis.2d 247, 201 N.W.2d 825 (1972).
    See also: Articles cited in footnote 5, ante, and additional articles as follows: Note, Economic Loss—Products Liability Jurisprudence, 66 Colum.L.Rev. 917 (1966) ; Franklin, When Worlds Collide: Liability

Theories and Disclaimers in Defective Product Cases, 18 Stan.L.Rev. 974 (1966) ; Kessler Products Liability, 76 Yale L.J. 887 (1967) ; Calabresi, The Costs of Accidents (1970) ; Comment, Strict Liability to the Bystander: A Study in Common Law Determinism, 38 U.Chi.L.Rev. 625–646 (1971) ; Kalven, Tort Law–Tort Watch, 34 ATL L.J. 44–59 (1972).