Michael LARUE, P. P. A., Plaintiff, Appellee,

v.

NATIONAL UNION ELECTRIC CORP., Defendant, Appellant.

Michael LARUE, P. P. A., Plaintiff, Appellant,

v.

NATIONAL UNION ELECTRIC CORP., Defendant, Appellee.

Nos. 77–1275 and 77–1276.

United States Court of Appeals, First Circuit.

Feb. 22, 1978.

As Amended Feb. 28, 1978.

Stephen T. Keefe, Jr., Quincy, Mass., for
National Union Electric Corp.

William Schwartz, Boston, Mass., with whom Edward M. Swartz, Boston, Mass., John C. Corrigan, Jr., Arlington, Mass., and Swartz & Swartz, Boston, Mass., were on brief, for Michael Larue p.p.a.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Conrad Larue brought this diversity action in January 1973, on behalf of his minor son Michael and in his own right, for injuries suffered by Michael. The complaint charged National Union Electric Corp. with negligent design and manufacture of a vacuum cleaner and breach of express and implied warranties. National Union denied all liability and alleged contributory negligence on the part of Michael. After a trial in March, 1977, during which Conrad Larue's claim was by stipulation merged into Michael's, the issues of negligence, implied warranty, and contributory negligence were submitted to the jury. A special verdict was returned upholding National Union on the warranty claim but finding for Michael on the negligence count. The jury determined that $125,000 would fully compensate Michael but that his own comparative negligence required reduction of the award to $93,750. National Union and Larue both appeal, the former both attacking the verdict as contrary to law and seeking a new trial because of allegedly erroneous evidentiary rulings, and the latter arguing the issue of comparative negligence should not have been submitted to the jury.

On January 25, 1971, Michael Larue, then 11 years old, was playing with his parents' canister-type vacuum cleaner, a Eureka Model 842A. He and his sister were home because they had missed the bus for school; his father was at work and his mother in school. The previous evening his mother had taken out the two filters that rested above the fan housing and motor in order to clean them. The morning of the accident the vacuum cleaner was left out in a hallway, plugged in, with the filters not yet replaced and the hood that covered its top half left open. Neither Michael nor his mother could remember whether the hose was attached to the vacuum cleaner or left hanging in a closet.

According to Michael's testimony, he was sitting on the yellow plastic filter support, which in turn rested on the metal casing that covered the fan and engine, riding the vacuum cleaner as if it were a toy car. He was dressed in pajamas. His older sister was in another room watching television. At some point in his play the motor was turned on. Michael continued to ride the vacuum cleaner until his penis slipped through openings in the filter support and casing into the fan. He immediately suffered an amputation of the head of his penis and part of the shaft. He rushed outside to seek help, was taken to the hospital, and underwent the first of a number of complicated operations to repair the damage to his penis.

National Union attempted to present a different account of how Michael suffered his injury. Dr. Shields, a urologist who first treated Michael after the accident, testified in a deposition that Michael originally told him he had started to vacuum his room and began to scratch his genital area with the hose. In so doing he somehow caught himself and severed his penis. National Union attempted to buttress this version of events through the expert testimony of Dr. Reservitz, a urologist, who gave the opinion that the probable cause of the injury was the hose end. Dr. Reservitz conceded on cross-examination, however, that if there were no evidence of blood at the tip of the hose, "[I]t wouldn't be probable" for the accident to have happened as he supposed. Because of the absence of any evidence of blood on the hose, the court ruled that Dr. Reservitz's opinion as to the accident's cause could not stand and ordered the jury to disregard it. Dr. Shields also had expressed doubt about the hose hypothesis. He testified that he had told Conrad Larue to look for the severed penis in the fan area of the vacuum cleaner, as he believed the injury could not have been caused by the hose. As Shields predicted, Larue found the penis in the fan area.

National Union also sought to suggest that Michael had deliberately caused the injury through evidence of observations by Dr. Shambaugh, a psychiatrist who interviewed Michael in the course of his treatment in Boston. Dr. Shambaugh's notes said:

"This 12 year old boy apparently put his phallus into a vacuum cleaner in Jan. 71. He is now having his second plastic operation on the organ. He is a bright, interested boy who told me about a long series of accidents beginning at age four when his sister knocked him off a teeter toter [sic]. Since then the accidents have been [mainly] self-inflicted, such as falling out of trees and nearly cutting a finger off with a floor sander a year or so ago. Sometimes he has been involved in fights with other boys and suffered minor trauma.

"Clearly then he has been concerned with the theme of bodily harm (& castration) for at least since the age of four."

Because Dr. Shambaugh was seriously ill by the time of trial, he was unable to testify as to any recollection of his interview with Michael. Counsel for National Union offered the notes solely for the purpose of impeaching previous testimony that Michael had had a normal, healthy emotional outlook before his accident. Counsel for the Larues asserted a purported patient-client privilege under both Maine and Massachusetts law. The district court ruled the privilege inapplicable but excluded the document anyway, although it did not make clear whether the ground was prejudice or irrelevance.

The principal issue at trial was the adequacy of safety features in the Eureka vacuum cleaner in light of foreseeable risks of injury resulting from household use. The Larues contended National Union had failed to take sufficient precautions both by not installing a shield over the opening in the engine and fan casing to prevent insertion of stray parts of the human body and by not using an "interlock" switch that would prevent the motor from turning on while the hood was up. The strongest evidence in support of these contentions was the testimony of plaintiff's expert, Dr. Paul, a design engineer on the MIT faculty. Dr. Paul contended that the vacuum was essentially a "booby trap" because of its lack of precautions. He explained that the rotation of the fan at 15,000 rpm left it invisible. Someone fiddling around with the interior of the machine, and especially a child, would have no warning of the danger created by the sharp, quickly moving fan blades. Some amount of exposure to the risk was inherent in the design, as the filters that covered the fan casing periodically had to be removed. Dr. Paul testified that suction created by the fan was sufficient to pull in stray items through the overlarge openings. He asserted that the safety devices that could eliminate this risk—a shield or an interlock switch—were feasible and, at least with regard to the switch, inexpensive.

To demonstrate the reasonableness of installing a protective shield over the fan housing, plaintiff produced a Eureka 4001 vacuum cleaner, manufactured during the same period as the 842A model and marketed overseas. The 4001 was in all material respects identical to the 842A, except that it was wired to take the higher voltages used in Europe and contained a shield over the fan housing such as would have prevented Michael's accident. The shield was required by Swedish safety regulations; National Union contended the risk that the shield was intended to guard against was an electrical hazard caused by the stronger current in use in Europe. The Larues argued the shield was intended to protect against the physical hazard as well. National Union objected to the introduction of the 4001 model into evidence, contending that it was manufactured over a different period than the 842A model, that it was irrelevant to the case at bar and unduly prejudicial to its case. After no evidence transpired as to differences in the periods of manufacture, the district court admitted the vacuum cleaner.

Both parties concede that the substantive law of Maine, the lex loci delictus, applies to this case and that Mrs. Larue purchased

the vacuum cleaner from someone other than National Union, the manufacturer. National Union seeks to exploit these two facts to obtain a ruling that plaintiff failed to bring himself within any exception to the privity requirement as it applies to products liability suits grounded in Maine law. The district court rejected this argument during the proceedings below.

In *Flaherty v. Helfont,* 123 Me. 134, 122 A. 180 (1923), the Supreme Judicial Court of Maine recognized both the general requirement of privity in products liability suits and the exception to the rule expressed in *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916). The *Flaherty* court stated:

> "In case of any such substance whose dangerous qualities are latent and not obvious, manufacturers, vendors, or distributors who intentionally or negligently fail to inform persons dealing with them of such qualities, or with greater reason misrepresent the same, are, notwithstanding want of privity, liable for injuries caused thereby to persons whose exposure to the danger could reasonably be contemplated."

*Id.,* 122 A. at 181. In *MacPherson,* Judge Cardozo, writing for the Court of Appeals, explained at length what kinds of products were subject to this exception to the privity requirement:

> "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

111 N.E. at 1053.

Although in many jurisdictions the exception formulated by *MacPherson* was extended to the point where it completely engulfed the rule, *see* W. Prosser, Handbook of the Law of Torts § 96 (4th ed.

1971), no such transformation took place in Maine. Hence when the Supreme Judicial Court confronted a similar problem in 1973, it felt constrained to hold that the privity requirement survived in Maine law as modified by *MacPherson,* until the legislature in 1969 abolished the privity requirement in all products liability cases. *McNally v. Nicholson Mfg. Co.,* 313 A.2d 913 (Me.1973). The enactment affected only transactions that occurred after 1969, and the court declined to override that expression of legislative intent by effecting a common law abandonment of privity for cases involving earlier transactions. *Id.* at 926. For these cases, the absence of privity between plaintiff and defendant would bar recovery unless the product could be deemed to possess a latent and hidden danger.

It is not immediately apparent that the legislative abolition of the privity requirement codified at Me.Rev.Stat. tit. 14, § 161, does not apply to this case. That measure does not apply to transactions that occurred before 1969, but it is not completely clear whether the term "transactions" refers to the original sale of the allegedly defective product or the accident that causes injury. In *McNally, supra,* both the purchase and injury took place before 1969. Here, Michael suffered his injuries after the effective date of the enactment, although the vacuum cleaner was purchased before that time. But some language in *McNally* does suggest that the term was meant to embrace both the purchase and injury, *see* 313 A.2d at 927, and in the absence of contrary indications we shall assume without deciding that § 161 does not apply.

■ The issue of the absence of privity was raised by National Union in motions for a directed verdict and for judgment n.o.v. At both points when the motions were made, however, the court had before it ample evidence that the Eureka 842A vacuum cleaner was such an "imminently dangerous" substance as to fit within the *MacPherson* exception to the privity requirement. The plaintiff's evidence indicated that the unguarded fan mechanism constituted an extremely serious hazard to limb, if not life, manifested in such a way

as not to be apparent to the average user. According to plaintiff's expert, the fan blades were sharp, close enough to the top of the casing to cut intruding objects, and moved at a great speed. When the motor was running, one could not see the motion of the blades and could not readily discern the danger. The hole was large enough for insertion of fingers and similar parts of the body. Inasmuch as the filters were removable and indeed had to be removed at regular intervals during which the motor could be turned on either intentionally or inadvertently, exposure to the risk of injury from the fan was a hidden but substantial incident of the vacuum cleaner's use. In short, both after the presentation of plaintiff's case and at the end of the trial the district court had sufficient grounds for refusing to rule as a matter of law that plaintiff had failed to prove that the Eureka vacuum cleaner came within the recognized exception to the privity requirement.

■ Neither *MacPherson, McNally,* nor *Flaherty* suggests the procedure to be applied in a case where the exception of the privity requirement is at issue: whether the applicability of the exception is to be decided as a question of law or to be submitted to the jury along with the issues of negligence and causation. In this case, however, National Union did not request any jury instruction pertaining to the "imminently dangerous" issue and did not object to the instructions on negligence that were given. It appeals only the denial of its motions for a directed verdict and judgment n.o.v. Consequently even if the issue of the privity requirement exception should have been submitted to the jury in some form, National Union has not preserved that question for appeal. *See Morris v. Travisono,* 528 F.2d 856, 859 (1st Cir. 1976).

National Union also argues that regardless of the nature of the hazard presented by the vacuum cleaner, this accident resulted from unforeseeable misuse of the product for which the manufacturer cannot be charged with liability. That question was intertwined with the conflicting accounts of how the accident occurred and was submitted to the jury as part of the issue of negligence. National Union does not dispute the adequacy of the court's instructions but argues that as a matter of law this use and the ensuing accident were simply not foreseeable, even if one fully accepts plaintiff's version of events.

In the analogous situation of a storeowner's duty of care to child invitees on the premises, the Supreme Judicial Court of Maine has ruled that the critical factor is

"the *reasonableness,* or the *unreasonableness,* of the risks of harm engendered by the premises, facilities, instrumentalities, or combinations thereof, in the light of the *totality of the circumstances,* as the ordinarily prudent storekeeper would apprehend the circumstances and foresee the dangers of harm generated by them, —including the reasonably recognizable dangers resulting from the reasonably foreseeable *misuse* of the premises by children in the light of their known, or reasonably recognizable, propensities."

*Orr v. First National Stores, Inc.,* 280 A.2d 785, 792 (Me.1971) [Emphasis in original.] In determining what kind of reasonable foreseeable misuse might arise from the play of children, the court recognized

"that children as old as thirteen years of age are likely to act dangerously to themselves even though, upon reflection, they know better."

*Id.* at 790. It also observed:

"It should be emphasized that it is unessential that the *precise* manner in which injuries might have occurred, or were sustained, be foreseeable, or foreseen. It is sufficient that there is a reasonable generalized gamut of greater than ordinary dangers of injury and that the sustaining of injury was within this range. . ."

*Id.* at 794.

■ It was undisputed that National Union realized that the Eureka 842A vacuum cleaner would be used in households where children would be present and appreciated the risks of children playing with the insides of the machine. Based on all the evidence presented at trial, there was a sufficient basis for holding that the vacuum cleaner presented an unreasonable risk of harm to children who might reasonably be

foreseen to explore and fiddle with the device. The inadvertent intrusion of Michael's penis into the fan, perhaps the product of the machine's suction, fell within this class of dangers, even though the precise circumstances of the accident might have been improbable. Under the principles expressed in *Orr,* the district court had a sufficient basis for refusing to rule that as a matter of law the injury to Michael was so unforeseeable as to be outside the scope of National Union's duty to consumers of its product. *See also LaForest v. Autoridad de las Fuentes Fluviales de P. R.,* 536 F.2d 443 (1st Cir. 1976).

■ By the same token, we reject plaintiff's argument that the evidence concerning the hidden danger presented by the vacuum cleaner was so unequivocal as to bar the district court from letting the issue of Michael's own negligence go to the jury. Plaintiff exaggerates the strength of his own case. Evidence was presented suggesting that the vacuum cleaner motor was switched on as long as two minutes before the accident; during that time Michael continued to ride the machine. Perhaps, as plaintiff's expert contended, the fan blades rotated at too great a speed to be visible, but the jury well might have believed that the sound of the motor alone should have been enough to warn Michael that some danger existed. There was evidence that Michael was familiar with the operation of machinery in general and engines in particular. The district court properly submitted the issue of comparative negligence to the jury. *See Wing v. Morse,* 300 A.2d 491 (Me.1973).

National Union claims that several adverse evidentiary rulings were erroneous and compel a new trial. It complains of the admission into evidence of the foreign counterpart of the Eureka 842A, which contained a shield that would have prevented an injury such as Michael's. It relies principally on *Doucette v. Vincent,* 194 F.2d 834 (1st Cir. 1952), a Jones Act case where we sustained the district court's exclusion of evidence of a "better and safer type of snatchblock that was used", saying

"evidence of the existence of better or safer machines or appliances is not admissible for the purpose of establishing the legal standard for conduct in negligence cases."

*Id.* at 837. In the same opinion, however, we recognized that a district court might in its discretion admit such evidence, with proper limiting instructions, to show that a defendant did not take the care required by law when he neglected to use better and safer appliances. *Id.* at 838. While no limiting instructions were given here, none were asked for.

■ The 4001 model appears to have been relevant to the issue of National Union's awareness of both design alternatives and the existence of potential hazards in the fan and motor area. Unlike *Doucette,* the defendant here was the manufacturer of the alternative appliance, and its use of the safety feature on the other machine tended to establish the foreseeability of the very risk involved in Michael's accident. Relevance was much more attenuated in *Doucette,* where plaintiff sought to introduce the allegedly safer appliance only to bolster a weak link in the purported chain of causation between the employer's conduct and his accident. Given the district court's discretion under the Federal Rules of Evidence, *see United States v. Oakes,* 565 F.2d 170, 173 (1st Cir. 1977); *United States v. Albergo,* 539 F.2d 860, 863 (2d Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976), we cannot hold the admission of the 4001 model to have been an abuse.

■ The other evidentiary objections raised by National Union are less substantial. The psychiatric notes excluded by the district court were of negligible probative value for the purpose for which they were ostensibly offered, and their potential prejudicial effect upon non-psychiatrically trained laymen was great. Some of the statements might well be understood not as reports of what Michael revealed to Dr. Shambaugh, *cf.* F.R.Evid. 803(5), nor a diagnosis of Michael's mental condition, but as Dr. Shambaugh's own guess as to how the accident might have happened. These problems were exacerbated by the present inability of Dr. Shambaugh to clarify or defend his remarks. The district court was

well within bounds in determining that, taken as a whole, the scant legitimate probative value of the notes was more than outweighed by their potential for prejudice.

 As for the opinion of Dr. Reservitz struck by the district court, the record as a whole provides no basis for the assertion of appellant that the factual prerequisite on which the testimony was conditioned—that blood be found on the tip of the hose—actually existed. The evidence introduced at trial indicated a scene of general carnage at the site of the accident, but no one was able to remember any sign of blood at the one spot Dr. Reservitz conceded it would have to be for his version of the accident to be "probable". Indeed, neither Michael nor his mother remembered if the hose was attached at the time of the accident. As the record failed to provide an independent basis for the hypothetical fact on which Dr. Reservitz conditioned his opinion, the district court properly struck the statement that the vacuum cleaner hose "would well be the offender agent in causing this injury." *See* 2 Wigmore on Evidence § 682 (3d ed. 1940).

*Affirmed.*